# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 22-311V

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| SOPHIANNE AND TIMOTHY TAGUACTA, as the legal representatives of their minor son, B.T., | Chief Special Master Corcoran |
| Petitioners, | Filed: November 20, 2025 |
| v. |  |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |  |
| Respondent. |  |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

*Curtis R. Webb,* Monmouth, OR, for Petitioners

*Irene A. Firippis,* U.S. Dep't of Justice, Washington, DC, for Respondent

**FINDINGS OF FACT AND CONCLUSIONS
OF LAW, and ORDER TO SHOW CAUSE**

    Petitioners in this matter allege, under the National Vaccine Injury Compensation Program[1] (the "Vaccine Program"), that B.T. (their minor son) experienced a Table encephalitis after receipt of a measles-mumps-rubella ("MMR") vaccine on April 8, 2019. Petition, filed March 22, 2022 (ECF No. 1). Respondent's Rule 4(c) Report, however, argues for the claim's dismissal—both because he contends the elements of a Table encephalitis (as applied to an infant) are not met, but also because Respondent deems the claim a "veiled autism case." Rule 4(c) Report, filed June 26, 2024 (ECF No. 25).

    After considering Respondent's contentions, I ordered the parties to brief the questions raised by the Rule 4(c) Report. Order, dated July 18, 2024 (ECF No. 26). They have now done so. Petitioner's Memorandum, dated February 18, 2025 (ECF No. 29) ("Br."); Respondent's Response, dated April 21, 2025 (ECF No. 32) ("Opp."). Based on review of those filings and the

---

[1] The Vaccine Program comprises Part 2 of the Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

filed medical records, I determine that a Table encephalitis claim is not tenable. The claim otherwise could be advanced as a causation-in-fact matter, although Petitioners will need to substantiate what that form of the claim would look like.

## I.     Medical History

*Vaccination and Initial Issues*

B.T. was born on April 4, 2018, at full term with no complications. Ex. 2 at 20. There is no record evidence of any health or developmental concerns about B.T. prior to the vaccinations at issue, and Petitioners do not otherwise allege they observed any symptoms in this interval pertaining to the case. *See* Affidavit of Sophianne Taguacta, dated March 18, 2022 (filed as Ex. 1) (ECF No. 1-2) ("Taguacta Aff.").

On April 8, 2019, B.T. had a one-year well-child visit with his then-pediatrician, Marilou Reyes, M.D., of Tiny Tots Pediatrics. At this time, he received MMR, varicella, and hepatitis A vaccines. Ex. 2 at 51. His development was deemed normal for a child his age. *Id.* at 50. There is no documented record within a week of this vaccination event memorializing any unusual vaccine reaction.

Fourteen days later (April 22, 2019), Mrs. Taguacta took B.T. back to Dr. Reyes, noting that B.T. "[d]oesn't want to walk, limping today." Ex. 2 at 53. The pediatric treatment record does not specify when these issues arose, but Mrs. Taguacta has alleged that they began April 15th—seven days post-vaccination, and thus a week before this particular pediatric visit. Taguacta Aff. at 2. It was also noted that he had experienced a fever two days prior. Ex. 2 at 53. On exam, B.T. was afebrile and alert, and although he limped on his left leg, he displayed full range of motion with his leg during the exam. *Id.* at 54. Dr. Reyes assessed B.T. with "[u]nspecified abnormalities of gait and mobility," and ordered imaging of B.T.'s hips and pelvis that was performed at Western Arizona Regional Medical Center ("Western") but revealed unremarkable results. *Id*; Ex. 3 at 29; *see also* Ex. 9 at 33. (Mrs. Taguacta also alleges that although the fever prior to the April 22nd pediatric visit had ended, B.T. cried, screamed, and was difficult to control, in this timeframe and even thereafter. Taguacta Aff. at 2–3).

*Heightened Medical Concerns in May 2019*

The next medical encounter is from May 2, 2019—now approximately twenty-four days post-vaccination—when B.T. received an eye exam with a chief complaint of "blurred vision." Ex. 4 at 7. No abnormalities were noted, however. *Id.* at 12. A week later (May 8, 2019), B.T. was taken to an urgent care treatment center due to fever, excessive crying, and a diffuse rash to his abdomen, chest, and face. Ex. 5 at 5–7. B.T. had been reportedly inconsolable the prior twenty-

2

four hours except when B.T.'s mother breastfed him. *Id.* at 6. (Mrs. Taguacta has specifically contended that the fever addressed at this urgent care visit began May 3–4, 2019, and became quite high, followed by a rash before the fever subsided. Taguacta Aff. at 3). On exam, however, B.T. was afebrile, although he did appear ill, and his rash was observed. *Id.* at 7. In addition, tests for a number of possible infectious explanations for the illness all yielded negative results. *Id.* These records contain no reports of B.T.'s health as having progressively worsened since or in reaction to his April 8th vaccinations.

It was recommended that B.T. go to the emergency room for further evaluation, and he was that same night taken to the Western ER. Ex. 3 at 39. Mrs. Taguacta informed treaters that B.T. had been favoring his left leg, losing his balance, rolling and stumbling backwards, and had "cried inconsolably for the past 5 days at home." *Id.* She also reported that B.T. had experienced a fever the prior Saturday (May 4, 2019—four days before) that resolved, but that he developed a rash to his neck, back and chest after. *Id.* B.T. seemed to want to "sleep all the time," and made "strange movements" with his body, but would not eat and otherwise been acting strangely. *Id.* B.T. was also noted to be experiencing diarrhea. *Id.* at 42.

(Petitioners contend that as of this ER visit, B.T. "was not talking at all," in contrast to his speech development prior to this point. Taguacta Aff. at 4. However, the medical records for this visit contain no such complaints).

An exam performed at the ER revealed "no apparent distress," despite B.T.'s otherwise-ill presentation, and no fever, but a "red, raised" rash was observed on his neck, back, and chest. Ex. 3 at 39. However, one emergency treater noted that B.T.'s gait was unsteady, and that he was unable to take five steps in a straight line. *Id.* at 42–43. B.T. did not "seem to have any purposeful movements of his extremities," and "as he cried, he extend[ed] his extremities in random directions." *Id.* at 43. A lumbar puncture revealed normal protein but elevated lymphocytes in his white blood cell count. *Id.* at 45. B.T. also underwent a CT scan in order to assess his seeming-ataxia and altered mental status—but it produced unremarkable results. *Id.* at 47.

Notes from treater conversations with Petitioners early the next morning (May 9, 2019) indicate that B.T. had been "intermittently fussy" while in the ER but would calm when nursed, and he remained afebrile. Ex. 3 at 44. The cerebrospinal fluid testing results were proposed to reflect the presence of a viral infection, and a course of antiviral medications was begun. *Id.* Otherwise, Western ER treaters recommended B.T.'s transfer to Kingman Regional Medical Center ("Kingman Regional") given that facility's pediatric expertise. *Id.* Although discharge notes suggested an "unsure diagnosis," Western ER treaters opined that B.T. was experiencing "likely viral meningitis vs [sic] encephalitis." *Id.*

Treaters at Kingman Regional evaluated B.T. after his transfer. Ex. 6 at 5–6. He was afebrile on intake, and deemed to be "in no significant distress" at that time. *Id.* Attending physician Dr. Saeed A. Khan observed B.T. to stand up and walk towards his mother without falling, although he "looked a little bit uncoordinated." *Id.* at 6. His admitting diagnoses were "acute gastroenteritis" and "possible viral infection," and it was proposed that he be monitored for any ongoing symptoms or concerns. *Id.* at 7.

Two days later (May 11, 2019), B.T. was discharged. *See generally* Ex. 6 at 2–4. His rashes and diarrhea had resolved, he now displayed a normal appetite, and he remained afebrile throughout his hospitalization. *Id.* at 4. Dr. Khan proposed that B.T. may have had a post-viral exanthem, "as the rash appeared just as the fever resolved," and did not offer additional commentary on balance or gait issues (although these matters were noted in the discharge summary). *Id.* at 3–4. Dr. Khan recommended that B.T. follow-up with his pediatrician. *Id.* at 4. In addition, the discharge records make no reference to any developmental concerns at this time—although Mrs. Taguacta's witness statement asserts that as of discharge, B.T. could only say "mama," and now would not walk at all. *Compare* Taguacta Aff. at 6 *with* Ex. 6 at 2–9.

On May 13, 2019 (now approximately five weeks after his vaccination), B.T. had a follow-up visit with Dr. Reyes. Ex. 2 at 55. The visit notes state that B.T. had been diagnosed with "viral syndrome with viral exanthem" at Kingman Regional, and Mrs. Taguacta reported that he was "always freaking out," adding concerns about difficulties he displayed in walking. *Id.* B.T. was at this time afebrile and did not have a rash, and it was recommended he follow up in one week. *Id.* at 56–57. That follow-up visit occurred on May 24th, at which time B.T. now was reported to have some kind of upper respiratory infection, although his exam was normal otherwise, and the record of this visit says nothing about concerns with gait or movement. Ex. 2 at 58–59. (Mrs. Taguacta has alleged that at this time (and even at subsequent appointments that summer) she mentioned concerns about B.T.'s speech to Dr. Reyes, but the records do not corroborate this contention—nor do they say anything about a possible vaccine adverse event. *Compare* Taguacta Aff. at 7 *with* Ex. 2 at 58–59).

*Subsequent Treatment in 2019*

More than two months later (and thus after the May 2019 treatment issues relating to B.T.'s rash and ataxia), B.T. had his 15-month wellness visit at the end of July with Dr. Reyes. Ex. 2 at 60. The record from this encounter states that there were "no parental concerns" expressed about B.T., including his development, behavior, or speech/communication. *Id.* at 60–61(noting that "there are no concerns about the way this patient speaks"). Rather, he was deemed to be "doing well, just a lot of energy." *Id.* at 60. And he demonstrated developmental milestones for a fifteen-month-old, including communication (three words), fine motor skills ("put block in cup" and "stoop and recover"), gross motor skills ("walk[s] backwards" and "walks well") and social skills

4

("waves goodbye"). *Id.* at 61–62. B.T.'s neurologic exam was normal, and he did not display a limp. *Id.* ("[t]his child's posture, tone, activity level, and symmetry of movement are within normal limits"). B.T. now received the Diphtheria-Tetanus-acellular Pertussis, Haemophilus influenzae type b, and pneumococcal conjugate vaccines. *Id.*

In another two months (an interval in which there is no evidence of any treatment events or recorded concerns), B.T. was taken back to Dr. Reyes for an 18-month wellness visit on October 10, 2019. Ex. 2 at 63. No concerns about his status were reported, other than drooling and being "fussy." *Id.* B.T. demonstrated appropriate developmental milestones for his age, including communication (six words), fine motor skills ("imitates scribbling," stacks a "tower of two blocks," and "use[s] a spoon and cup with help"), gross motor skills ("walk[s] backwards," "walks up steps," and running) and social skills ("helps in house" and is able to "remove some clothing"). *Id.* And his exam was otherwise unremarkable. *Id.* at 64 (visit diagnosis is listed as a "routine child health exam [without abnormal findings]" and "teething syndrome").

*2020: Evidence of Developmental Regression/Autism Signs*

It is not until early 2020—nine months after the purportedly-injurious vaccinations—that records memorialize concerns about B.T.'s development. After this time, the Petitioners began to recount to treaters a medical history contrary to what is set forth above.

On January 20, 2020, B.T. was taken to Dr. Reyes in follow-up from a recent Western ER visit for a barky cough. Ex. 2 at 66; Ex. 3 at 117. Mrs. Taguacta also, however, expressed the concern that B.T.'s speech had "*started* regressing" because he could now only say eight words, and she asked for a speech evaluation. Ex. 2 at 66. (emphasis added). Dr. Reyes ordered an evaluation with Early Intervention Program and a speech therapy consultation with an audiologist, Dr. Katie Brown, at Kingman Regional. *Id.* at 67–68.

Three months passed before B.T. returned to Dr. Reyes for his two-year wellness visit, in April 2020. Ex. 2 at 69. B.T.'s mother again raised concerns that B.T. did not speak, respond to his name or interact with others. *Id.* She also noted that he ran in circles, lined up his toys in a straight line, and cried as night. *Id.* B.T. was receiving treatment from Early Intervention, but B.T.'s mother was unsatisfied with the treatment and requested a referral to a specialist. *Id.* The treatment notes from this visit indicate that B.T. did not demonstrate certain communication developmental milestones for a two-year-old child, such as combining words, naming one picture, and pointing to two pictures. Ex. 2 at 69. B.T.'s neurologic exam was otherwise normal, and he did not display a limp. *Id.* at 70. Dr. Reyes referred B.T. to Dr. Mary Allare, Phoenix Perinatal Associates, for a developmental and behavioral consultation. *Id.*

Later on, in the early fall (September 4, 2020), B.T. had a developmental evaluation with Dr. Allare. Ex. 9 at 8. Dr. Allare reported that B.T. had speech delays and some behavior concerning for autism spectrum disorder ("ASD"). *Id.* Dr. Allare noted (in connection with the medical history provided by Mrs. Taguacta) that at thirteen months B.T. had "developed encephalitis and was hospitalized" at Kingman Regional. *Id.* Mrs. Taguacta expressed the view that B.T.'s purported encephalitis had "occurred immediately after an immunization and that [B.T.] is allergic" to the MMR vaccine. *Id.* B.T. underwent a Screening Tool for Autism in Toddlers ("STAT") exam, but Dr. Allare concluded that his scoring was not consistent with ASD, and proposed he return in six months for a follow-up assessment. *Id.* at 14.

That same fall, the Taguactas initiated pediatric care for B.T. with a new treater, Dr. Nalia Tariq at Children's Medical Center, and had their first visit with Dr. Tariq on September 11, 2020. Ex. 11 at 31. It was reported at this time that B.T. was no longer talking or sleeping and was unfocused, and Mrs. Taguacta expressed the concern that he might have an ASD. *Id.* Dr. Tariq referred B.T. to the same audiologist proposed by Dr. Reyes (Dr. Brown). *Id.*; *see also* Ex. 11 at 6.

On November 11, 2020, B.T. saw Carol McLean, Ph.D., HSPP, Developmental and Educational Psychological Services, for an ASD assessment, based on the Petitioners' concerns. Ex. 7 at 37; Ex. 11 at 153. Dr. McLean noted B.T.'s medical history included a three-day hospital stay for encephalitis "which was resolved with fluids and antibiotics." Ex. 7 at 37. B.T. underwent the Developmental Assessment of Young Children, Second Edition ("DAYC-2"), an "individually administered, norm-referenced measure of early childhood development in the domains of Cognitive, Communication, Social-Engagement Adaptive Behavior, and Motor skills." *Id.* at 38. B.T. scored 83 under DAYC-2, falling in the "Below Average" range. *Id.* Dr. McLean also administered to B.T. an autism assessment, Autism Diagnostic Observation Schedule—Second Edition, Module 1, Pre-Verbal/Single Works. *Id.* Dr. McLean diagnosed B.T. with ASD, Level 2, "requiring very substantial support." *Id*. at 38–39.

Subsequent visits with pediatric treaters consistently echoed and confirmed the ASD diagnosis. *See, e.g*., Ex. 11 at 124 (May 6, 2021 visit with Dr. Tariq) and 14 (June 29, 2022 visit to Dr. Tariq). B.T. also had an occupational therapy evaluation in May 2021 with Jeanne Fuscom MR, OTR/L at Places You'll Go Pediatric Therapy. *Id* at 109. It was now reported that B.T.'s "normal milestones were observed until following the third dose of MMR," and Mrs. Taguacta noted at this time that "in retrospect, [B.T.] had gotten sick after each dose of vaccine with the third being the most significant." *Id.* at 110. Similar representations were made at a speech and language therapeutic evaluation that same month. *See generally id.* at 103. The history section from this visit states that B.T. "was developing normally and developed atypical symptoms after immunization shot including [signs and symptoms] of autism and atypical communication." *Id.*

His health history also notes that B.T. was "recently *formally diagnosed* with autism spectrum disorder." *Id*. (emphasis added).

## II.  Parties' Arguments

*Petitioner*

The Vaccine Act, Petitioners observe, presumes entitlement for injuries of encephalopathy or encephalitis that develop within five to fifteen days after receiving the MMR vaccine. 42 C.F.R. § 100.3(a)(III). The Table injury of encephalitis is defined as an injury that meets the definition of an *acute* encephalitis (occurring within the applicable time frame) that results in a *chronic* encephalopathy. Br. at 1–2 (quoting 42 CFR § 100.3(c)(3)). Petitioners argue that the record provides a reasonable basis for finding that B.T. suffered a Table encephalitis injury. *Id*.; Br. at 2–5.

Acute encephalitis, for purposes of the Vaccine Table, is evidenced by neurologic dysfunction, such as ataxia, plus evidence of an inflammatory process in the brain. Br. at 2 (quoting 42 CFR § 100.3(c)(3)(i)). The record in this case, Petitioners contend, establishes that B.T.'s mother noticed he was limping around April 15, 2019, only seven days after receiving his MMR vaccine. Br. at 2 (citing Taguacta Aff. at 2). B.T.'s limping progressed into random leg and arm movements, and he was seen by multiple providers before eventually being diagnosed with ataxia after a CT scan. *Id.* at 2–3 (citing Taguacta Aff. at 1–3; Ex. 2 at 53–54; Ex. 3 at 39, 47, 61). Evidence of an inflammatory process in the brain for people over two months old is shown by a cerebrospinal fluid ("CSF") white blood cell count of more than 5/mm$^3$. *Id.* at 4 (quoting 42 CFR § 100.3(c)(3)(i)(B)). B.T.'s CSF white blood cell count was 9/mm$^3$—safely satisfying that B.T. was experiencing an inflammatory process in his head. *Id.* (citing Ex. 3 at 44; Ex. 6 at 3–4).

The Petitioners next turn to attempting to demonstrate that B.T.'s acute encephalitis developed into a chronic injury. Br. at 5. An acute encephalitis becomes chronic encephalopathy when symptoms of acute encephalitis persist for at least six months. *Id.* at 2 (quoting 42 CFR § 100.3(d)(1)(i)). Pointing to the same evidence, Petitioners claim that both B.T.'s ataxia and regressive speech lasted beyond six months. *Id.* at 5. Mrs. Taguacta's Affidavit states that B.T.'s difficulty "walking has never returned to normal" as of March 2022, and she was concerned about B.T.'s speech delay for at least eight months after B.T.'s hospital stay. *See id.* at 5, 7, 9 (citing Taguacta Aff. at 4, 6–7). B.T.'s medical records document that could say three to four words at his April 8, 2019, visit and could only still say the same amount almost four months later at his July 29, 2019, visit. *See id.* at 10 (citing Ex. 2 at 50, 61). By October 10, 2019, B.T. had progressed to saying six words. *Id.* (citing Ex. 2 at 62). B.T.'s mother expressed concerns of B.T. only being able to say eight words during his January 20, 2020, visit and was given a referral to a speech and

7

hearing doctor. *Id.* (citing Ex. 2 at 66–68). However, providers did not assess how many words B.T. could say at the time of this visit. *Id.* (citing Ex. 2 at 66).

Petitioners also claim that B.T.'s medical records show that he was having trouble walking through May 2019. Br. at 7 (citing Ex. 2 at 55). Admittedly, records from his June 29, 2019, and October 10, 2019 well-child visits did not describe any difficulty walking, but Petitioners argue that this is inconsistent with later observations of having poor balance and being "clumsy" during occupational therapy visits in August 2022. *Id.* at 8 (citing Ex. 11 at 40). Petitioners assert that documented difficulty walking and the affidavit show B.T. had problems with balance and walking for over six months. *Id.* Altogether, Petitioners assert that the record provides a reasonable basis for a finding of a chronic encephalopathy. *Id.* at 10.

Petitioners further maintain that if they can demonstrate that B.T. did not return to his "baseline neurologic state" within six months after the onset of his acute encephalitis, they are entitled to a presumption that his chronic encephalopathy/current disorder is a likely sequela of his acute encephalitis. Br. at 13. Therefore, they argue, because B.T.'s symptoms include motor, neurologic, and other "global delays," those symptoms are presumable sequalae of B.T.'s acute encephalitis. *Id.*

Petitioners also address Respondent's contention that their claim actually seeks to establish autism as a vaccine injury. Br. at 14. They maintain B.T. likely did not experience an ASD. *Id.* at 14-15. Moreover, they point out that their claim is founded on the Vaccine Table and the presumption of entitlement for those who suffer acute encephalitis within five to fifteen days after receiving the MMR vaccination. *Id.* The emphasize record support for the conclusion that B.T. suffered developmental delays from acute encephalitis. *Id.* at 14. Most cases of acute encephalitis cause neurologic damage from injuring the cerebellum and other portions of the brain, which impacts balance, coordination, and speech impairment—and the record substantiates these symptoms. *Id.*

In Petitioners' view, the record provides evidence to doubt the propriety of an autism diagnosis. Br. at 14–15. There is, for example, no indication that B.T. is adverse to social interaction—which is a prominent symptom of autism. *Id.* at 15. Petitioners also raise concern that the developmental evaluation improperly showed that B.T. had autism. *Id.* Petitioners specifically point out that most points of the evaluation were related to the language delay without considering acute encephalitis as a cause. *Id.* (citing Ex. 11 at 154). B.T.'s evaluating provider noted that B.T.'s behavior at a visit after testing was "not consistent with a diagnosis of autism." *Id.* (quoting Ex. 9 at 13–14).

Petitioners conclude by adding that even if an autism diagnosis has preponderant support on the basis of this record, it would not establish a factor unrelated defense for the Respondent.

8

Br. at 16. To establish that defense, it is Respondent's burden to (1) demonstrate B.T. suffers from autism; (2) identify the cause of B.T.'s autism; and (3) show that B.T.'s autism was the only explanation for his condition, with the MMR vaccine playing no role at all. *See id.* at 17; *De Bazan v. Sec'y of Health and Hum. Services*, 539 F.39 1347, 1352 (Fed. Cir. 2008). Even with the diagnosis, Respondent would have to show more to construct a preponderantly-supported factor unrelated defense against Petitioners' claim. Br. at 17. And the record does not support another factor being the sole cause of B.T.'s injuries, Petitioner's argue, so Respondent could not successfully raise the defense regardless. *Id.*

*Respondent*

Respondent argues that Petitioners' claim should be dismissed for failure to show that B.T. suffered from chronic encephalopathy for six months following the onset of his symptoms. Opp. at 2.

Respondent begins by claiming that Petitioners cannot satisfy the showing for a Table claim. Witness statement evidence, he argues, is insufficient proof alone for B.T.'s symptoms. Opp. at 13. Respondent also notes that Mrs. Taguacta's affidavit was executed close to three years after the inciting incident. *Id.* In addition, the "Vaccine Act expressly bars the court or a special master from finding a Table injury elements are met 'based on the claims of the petitioner alone, unsubstantiated by medical records or by medical opinion.'" *Id.* at 14 (quoting *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) (quoting 42 U.S.C. § 300aa–13(a)(1))). Respondent thus urges limited weight be given to any of Petitioners' arguments that are supported by affidavit alone. *Id.*

Respondent then asserts that Petitioners have failed to provide any evidence that B.T. experienced neurological dysfunction or an inflammatory process in the brain during the Table period of five to fifteen days. Addressing B.T.'s ataxia and other neurological dysfunction symptoms, Respondent points out that there are no medical records that document any of these symptoms in B.T. until *after* 15 days from B.T.'s vaccination. Opp. at 14. The only treatment evidence that mentions "difficulty walking" was from B.T.'s April 22, 2019, presentation to Dr. Reyes—fourteen days after vaccination. *Id.* (citing Ex. 2 at 53). But the medical records from this visit showed B.T. was limping, but otherwise displayed full range of motion in his left leg. *Id.* (citing Ex. 2 at 54).

Respondent also maintains that there is no evidence that B.T. experienced an inflammatory process within fifteen days after vaccination. Opp. at 16. There is no record of lab work, fever, electroencephalogram findings consistent with encephalitis, or neuroimaging findings consistent with encephalitis within the fifteen-day window. *Id.* Respondent concedes that there is evidence of an inflammatory process as of B.T.'s May 8, 2019, provider visit, but this occurred a month

9

after vaccination. *Id.* Also, the medical records the Petitioner cites do not establish that ataxia continued through B.T.'s hospital stay, but rather show that any possible ataxia had resolved upon hospital discharge. *Id.* at 17 (citing Ex. 6 at 3).

Respondent points to the same evidence to show that B.T.'s neurological dysfunction and inflammatory process did not last six months. Opp. at 18. B.T.'s discharge from Kingman Regional documented a resolution of viral symptoms on May 11, 2019. *Id.* (citing Ex. 6 at 4). There is also no discussion of B.T.'s speech or language skills during the April 2019 presentation to Dr. Reyes, or his hospitalization from May 8–11, 2019. *Id.* In addition, there are multiple provider visits in May through October 2019 that do not note encephalopathic symptoms. *Id.* at 18–19 (citing Ex. 2 at 55–65). Although medical records may not contain an all-inclusive list of all issues reported or discussed at a visit, witness statements regarding B.T.'s purported ongoing symptoms from May 2019 onward are at odds with the contemporaneous records from multiple visits with Dr. Reyes, which speak to the "nonexistence" of symptoms. *Id.* at 21.

Respondent further denies that Petitioners are entitled to a presumption that B.T. suffers from residual neurological damage (and therefore sequela of his acute encephalitis) because B.T. did not return to his neurologic baseline within six months from the first symptom of his alleged acute encephalitis. Opp. at 21–22. Respondent contends that Petitioners' "converse" reading of the Qualifications and Aids to Interpretation ("QAI") definition of "chronic encephalopathy grossly misinterpreted the QAI," and notes that Petitioners did not cite to any authority in support of this interpretation. *Id.* at 22. Based on the above, Respondent asserts that Petitioner has failed to show an encephalitis Table claim. *Id.*

Rather than a Table encephalitis, Respondent argues that B.T. was properly diagnosed with ASD, which is not a recognized vaccine injury. Opp. at 22. While Petitioners deny the validity of such a diagnosis, the record is clear that B.T. was properly diagnosed with ASD. *See id.* B.T.'s symptoms of coordination and speech regression are signs of ASD and multiple providers, at some point in their treatment of B.T., noted a concern for autism or ASD, and that B.T. was in fact so diagnosed. *Id.* at 23 (citing to Ex. 2 at 70; Ex. 9 at 14; Ex. 7 at 37; Ex. 11 at 153). Petitioners try to undermine the results of B.T.'s ASD diagnostic evaluation, but Respondent points out that they do not cite any authority regarding the proper diagnosis of ASD, and the medical record contradicts Petitioners' weak argument. *Id.* at 23–26. In fact, Petitioners cannot distinguish any symptoms in B.T. that are indicative of encephalitis and not ASD. *Id.* at 26.

Given the evidentiary strength of B.T.'s ASD diagnosis, Respondent deems this case to be indistinguishable from the large number of past autism injury claims that have uniformly been dismissed. Opp. at 26 (citing to *Lehner v. Sec'y Health & Hum. Servs,* No. 08-554, 2015 WL 5443461, (Fed. Cl. Spec. Mstr. July 22, 2015); *Franklin v. Sec'y Health & Hum. Servs,* No. 99-

855V, 2013 WL 3755954, (Fed. Cl. Spec. Mstr. May 16, 2013); *Waddell v. Sec'y Health & Hum. Servs,* No. 10-316V, 2012 WL 5443461, (Fed. Cl. Spec. Mstr. July 22, 2015)).

## III. Relevant Table Elements

The QAIs relevant to a Table encephalitis claim state as follows:

(3) *Encephalitis.* A vaccine recipient shall be considered to have suffered encephalitis if an injury meeting the description below of acute encephalitis occurs within the applicable time period [5-15 days for post-vaccination onset] *and results* in a chronic encephalopathy, as described in paragraph (d) of this section.

(i) *Acute encephalitis*. Encephalitis is indicated by evidence of neurologic dysfunction [as provided in subsection (A) below], *plus* evidence of an inflammatory process in the brain [as described in subsection (B) below].

(A) Evidence of neurologic dysfunction consists of either:

(1) One of the following neurologic findings referable to the CNS [central nervous system ("CNS")]: Focal cortical signs (such as aphasia, alexia, agraphia, cortical blindness); cranial nerve abnormalities; visual field defects; abnormal presence of primitive reflexes (such as Babinski's sign or sucking reflex); or cerebellar dysfunction (such as ataxia, dysmetria, or nystagmus); or

(2) An acute encephalopathy as set forth in [§ 100.3(c)(2)(i)].

(B) Evidence of an inflammatory process in the brain (central nervous system or CNS inflammation) must include cerebrospinal fluid (CSF) pleocytosis (>5 white blood cells (WBC)/mm3 in children >2 months of age and adults; >15 WBC/mm3 in children <2 months of age); or at least two of the following:

(1) Fever (temperature ≥ 100.4 degrees Fahrenheit);

(2) Electroencephalogram findings consistent with encephalitis, such as diffuse or multifocal nonspecific background slowing and periodic discharges; or

11

> (3) Neuroimaging findings consistent with encephalitis, which include, but are not limited to brain/spine magnetic resonance imaging (MRI) displaying diffuse or multifocal areas of hyperintense signal on T2-weighted, diffusion-weighted image, or fluid-attenuation inversion recovery sequences.

42 C.F.R. § 100.3(c)(3) (emphasis added). For a vaccine containing measles, mumps, and rubella virus, or any of its components, the acute encephalitis must occur between five and fifteen days after receipt of the vaccine. *Id*. at § 100.3(a)(III).

After an acute encephalitis is established, a party must also demonstrate a subsequent chronic encephalopathy. This "occurs when a change in mental or neurologic status, first manifested during the applicable Table time period as an acute encephalopathy or encephalitis, persists for at least [six] months from the first symptom or manifestation of onset or of significant aggravation of an acute encephalopathy or encephalitis." 42 C.F.R. § § 100.3(d)(1)(i). Further, "individuals who return to their baseline neurologic state, as confirmed by clinical findings, within less than 6 months from the first symptom or manifestation of onset or of significant aggravation of an acute encephalopathy or encephalitis *shall not be presumed to have suffered residual neurologic damage from that event*; any subsequent chronic encephalopathy shall not be presumed to be a sequela of the acute encephalopathy or encephalitis." *Id*. at § 100.3(d)(1)(ii) (emphasis added).

In essence, Table claimants seeking to prove a vaccine-caused encephalitis must establish that the injured party experienced an initial, "acute" injury that later became chronic. *See, e.g., Bello v. Sec'y of Health & Hum. Servs*., No. 20-739V, 2021 WL 5070179, at *10 (Fed. Cl. Sept. 10, 2021); *Thompson v. Sec'y of Health & Hum. Servs*., No. 15-1498V, 2017 WL 2926614, at *7–8 (Fed. Cl. Spec. Mstr. May 16, 2017).[2]

Prior Program claimants have tried and failed to bring claims for purported encephalitis that later were alleged to have produced neurologic injury manifesting as developmental issues—often because claimants cannot establish one or both of the primary elements. *See*, *e.g.*, *Ramsey v. Sec'y of Health & Hum. Servs*., No. 21-1486V, 2023 WL 2823403, at *9 (Fed. Cl. Apr. 7, 2023) (denying encephalitis Table claim where the only evidence in favor of chronic encephalopathy was based on parental reports only); *Lehner*, 2015 WL 5443461, at *15–16, *33 (petitioners failed to demonstrate that flu vaccine resulted in autoimmune encephalitis). The majority of these cases

---

[2] Some of these cases involve a slightly different Table claim—that someone experienced an acute encephalopathy. *See, e.g*, *Bello*, 2021 WL 5070179, at *10. There is overlap with such claims, however—especially in a pediatric context—but admittedly Petitioners herein need only satisfy the QAIs specific to encephalitis.

12

heavily rely on parent recollection of post-vaccination behavioral changes that are uncorroborated by contemporaneous medical records.

## ANALYSIS

### I.  An Encephalitis Table Claim Cannot be Substantiated on this Record

B.T.'s medical history is inconsistent with the Table's definitions and restrictions for an encephalitis attributable to the MMR vaccine. Although *some* elements of such a claim are likely met based on the record, others are not.

As the foregoing review of the elements of a Table encephalitis claim establishes, the relevant QAIs require a claimant to prove *both* an acute encephalitic incident (essentially meaning evidence of brain inflammation) *followed by a resulting* chronic encephalopathy—and there are specific aspects of this showing applicable to infants under the age of 18 months, like B.T. 42 C.F.R. § 100.3(c)(2)(i)(A). But even assuming that Petitioners could establish an acute encephalitis (and I acknowledge there is record evidence in support of that conclusion),[3] the claim's secondary requirement - that the "change in mental or neurologic status [evidenced in the acute encephalitis] . . . persists for at least [six] months" thereafter (42 CFR § 100.3(d)(1)(i))—lacks record support. Rather, the medical record only establishes as follows:

- B.T. developed a fever and related rash in early to mid-May 2019;

- Concerns about ambulation and ataxic behaviors were expressed at this time, but were not identified by treaters as significant, or evidence of continued encephalitis; and

---

[3] The record establishes that B.T. was slightly more than 12 months old on April 8, 2019, when he received the MMR vaccine. Then, within 14 days, he was taken to the pediatrician with reports of a resolved fever and evidence of some ataxia, coupled with complaints of unconsolable distress (although the latter by itself is not deemed evidence of acute encephalitis alone). Ex. 2 at 53–54. Ataxia constitutes a "cerebellar dysfunction" reflecting a neurologic finding of the kind the AQI defines as an acute encephalitis—and this occurred within the 5–15 day post-vaccination timeframe for the Table claim. Thus, this initial part of the test for acute encephalitis is likely met.

As for demonstrating the existence of an inflammatory process in the brain, the Vaccine Table requires evidence of such a process, such as a "cerebrospinal fluid (CSF) pleocytosis (>5 white blood cells (WBC)/mm3 in children >2 months of age and adults." 42 CFR § 100.3(c)(3)(i)(B). Petitioners contend that B.T.'s CFS results did meet the inflammatory requirements, even though CFS testing was performed outside of the 15-day table window. Br. at 4 (citing Ex. 3 at 44), 5. I will assume for purposes of analysis that this has also been established, since the lack of preponderant evidence of subsequent chronic encephalopathy is dispositive.

13

- Thereafter and through January 2020—nearly *nine months* after the April 2019 incidents—no concerns or complaints were again raised with treaters about the ataxic issues addressed in April or May.

The same is even more true for contentions about speech regression in this timeframe. While Petitioners *allege* in witness statements that B.T.'s speech development reversed during this timeframe and beginning in mid-May 2019, these contentions find no record corroboration at all. I am not compelled to accept them as true simply because witness statements so maintain. Nor must I embrace the argument that all of the medical records (which are not merely silent on developmental concerns, but reflect healthy development throughout this period) simply omit things told to the treaters, absent other corroborative evidence that would suggest Petitioners *did in fact* experience what they now allege. *See, e.g., Cucuras*, 993 F.2d at 1528; *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")

Thus, this record does not establish that after any acute encephalitic event B.T. arguably experienced in April 2019, he *also* went on to experience a chronic encephalopathy. *See Ramsey*, 2023 WL 2823403 at *9. That requires proof that the encephalopathy existed, but record evidence from the May-December 2019 interval is unsupportive of concerns about B.T.'s mental status of neurologic development. And evidence of encephalopathy is not persuasively proved by treater visits occurring *after* this period—especially where, as here, treaters were then informed the developmental issues *had only recently manifested*. *See, e.g.*, Ex. 2 at 66 (Petitioners' reports at January 20, 2020, visit with Dr. Reyes that B.T. had "started regressing").

I otherwise do not find persuasive Petitioners' contention that there was no "return to baseline" after the April-May 2019 evidence of ataxia. As of B.T.'s May 11, 2019 hospital discharge (and even though treaters were aware of concerns about B.T.'s movement at that time), no mention was made of any ongoing need to evaluate him for ataxia or neurologic/motor issues. Ex. 6 at 2–4. Concerns were mentioned at his next pediatric visit in mid-May, but again no further treatment of this problem was proposed. Ex. 2 at 55, 58–59. Then came wellness visits in the ensuing six months—and no further reports of ataxia or anything comparable were raised. *Id.* at 60–64. This record is wholly inconsistent with the conclusion that B.T. was throughout this time experiencing a chronic encephalitic state, but instead speaks to his overall health during this period, regardless of later developmental issues in 2020 and thereafter.

## II. Petitioners May Attempt to Articulate a Causation Claim Based on the Existing Evidence and My Findings of Fact

In the Vaccine Program, cases that do not satisfy one or more elements of a Table claim are not automatically subject to dismissal. Rather, it is often appropriate to permit the claimant a

chance to articulate (under the test set by the Federal Circuit in *Althen v. Sec'y of Health & Hum. Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005)), a causation-in-fact claim, based on the same facts (while taking into account the facts that rendered the Table claim untenable).

The record in this case does establish that B.T. experienced some unusual symptoms not long after the receipt of several covered vaccines in April 2019. Those symptoms lead to medical concerns that same month, then hospitalization in May 2019—followed by a lengthy quiescent period for over half of 2019, during which time (despite Petitioners' allegations to the contrary) no reports of developmental or other concerns were ever expressed to treaters. Then, beginning in 2020, the record establishes that B.T. began to exhibit developmental issues that Petitioners likely believe could be a sequela of his earlier, purported vaccine reactions.

This *could* be the basis of a causation claim, and it is only fair that Petitioners be afforded the chance to recast their claim in this regard. But I note my initial reasoned skepticism that such a claim has any likelihood of success. Many prior claimants have attempted to argue a child's developmental regression[4] was vaccine-caused, but, more often than not, a record comparable to this one (and where claims of *observed* regression are not independently corroborated by medical record evidence) does not result in a finding of entitlement. *See, e.g., A.S. v. Sec'y of Health & Hum. Servs.,* No. 16-551V, 2019 WL 5098964, at *2 (Fed. Cl. Aug. 27, 2019) (no evidence of post-vaccination encephalopathic reaction to vaccine that could later have produced expressive language disorder or autism); *Schneider v. Sec'y of Health & Hum. Servs.*, No. 18-30V, 2019 WL 2290920, at *3 (Fed. Cl. Apr. 10, 2019) ("[a]lthough M.A.M.'s medical record does suggest that he experienced relatively rapid language skill regression shortly after his first birthday, it does not indicate that he experienced either the kind of neurologic dysfunction or inflammatory process that would qualify as acute encephalitis"); *Thompson*, 2017 WL 2926614, at *15 ("[b]ut the basis for my decision is rooted in the undisputed facts—the lack of recorded medical evidence documenting regression shortly after vaccination . . . .").

Petitioners will need to outline what such a causation claim would look like, and what medical or scientific evidence exists to support it. To that end, they may consult with an expert (although no report should be commissioned or filed at this time). They should also be prepared to cite to any favorable reasoned Program determinations that parallel the causation theory to be advanced herein. If they cannot demonstrate such a claim would possess reasonable basis, the matter will be dismissed.

---

[4] I take note of Respondent's objections about a possible ASD injury in this case. The record contains ample instances in which it appears B.T. was so diagnosed, although Petitioners disclaim the diagnosis's validity. Br. at 14–15. This is a matter that can be resolved in adjudication of a causation version of this claim. Petitioners should nevertheless take into account that (as Respondent has pointed out) the Program has *never* found that an ASD condition could be vaccine-caused. If the evidence in this case establishes that the ASD diagnoses are likely correct, Petitioners' ability to prove a vaccine-caused developmental regression would be implicated.

15

## CONCLUSION

Because certain elements of a Table encephalitis claim cannot be met, Petitioners' Table claim is dismissed. On or before February 27, 2026, Petitioners shall show cause why a causation-in-fact claim in this matter should not also be dismissed. In so doing, they may consult with an expert, and they should in responding to this Order identify any comparable Program cases in which claimants succeeded based on comparable evidence. Respondent's reaction to Petitioners' filing shall be filed on or before March 31, 2026.

**IT IS SO ORDERED.**

s/Brian H. Corcoran
Brian H. Corcoran
Chief Special Master
