# In the United States Court of Federal Claims

No. 22-311
(Filed Under Seal: August 19, 2026)
Reissued: September 3, 2026*

SOPHIANNE TAGUACTA and TIMOTHY TAGUACTA, as legal representatives of their minor son, B.T.

Petitioners,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

*Curtis R. Webb*, Attorney at Law, Monmouth, Oregon, for Petitioners.

*Irene A. Firippis*, Trial Attorney, United States Department of Justice, Civil Division, Torts Branch, Washington, D.C., for Respondent.

**OPINION AND ORDER**

***SMITH*, Senior Judge**

In 1986, Congress enacted the National Childhood Vaccine Injury Act "to provide compensation for vaccine-related injuries and deaths." *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1325 (Fed. Cir. 2011); *see* 42 U.S.C. §§ 300aa-1 *et seq.* The Vaccine Act arose, in part, because while "most of the Nation's children enjoy greater benefit from immunization programs, a small but significant number have been gravely injured." *Cloer*, 654 F.3d at 1325 (citations omitted). Petitioners Sophianne and Timothy Taguacta ("Petitioners") bring this action under the Vaccine Act on behalf of their son, B.T. Petitioners allege that B.T. suffered from an encephalitis after receiving a measles, mumps, and rubella ("MMR") vaccine as an infant.[1] In November 2025, Chief Special Master Brian Corcoran concluded that B.T. did not suffer from a

* An unredacted version of this Opinion was filed on August 19, 2026. *See* ECF No. 49. The Court provided the parties with the opportunity to submit proposed redactions. *Id.* at 11. The parties did not propose any redactions.

[1] "Encephalitis [] is inflammation of the brain. It can be caused by viral or bacterial infections, or by immune cells mistakenly attacking the brain." *See* Mayo Clinic Staff, *Encephalitis Symptoms and causes*, Mayo Clinic (May 16, 2024), https://www.mayoclinic.org/diseases-conditions/encephalitis/symptoms-causes/syc-20356136.

chronic encephalopathy and therefore dismissed petitioners' claim. *See* Findings of Fact and Conclusions of L., ECF No. 37. Before the Court are petitioners' motion for review of the Chief Special Master's decision. *See* Pet'rs' Mot. for Review, ECF No. 43. For the following reasons, the Court **AFFIRMS** that decision.

## I. BACKGROUND

A more comprehensive review of B.T.'s medical history can be found in the Chief Special Master's Findings of Fact and Conclusions of Law. *See* ECF No. 37. The Court provides the following relevant facts below:

On April 4, 2018, B.T. was born at full term with no complications. Pet'rs' Ex. 2 at 20. B.T. visited Dr. Marilou Reyes, his pediatrician, for his 12-month visit on April 8, 2019, where he received an MMR vaccination. *Id.* at 49, 51. On April 22, 2019, B.T.'s mother brought him back to Dr. Reyes, complaining that he "doesn't want to walk, limping today." *Id.* at 53. B.T.'s medical records also note that he suffered from a fever two days before his visit with Dr. Reyes. *Id.* Upon examination, Dr. Reyes diagnosed B.T. with "unspecified abnormalities of gait and mobility" and ordered imaging of his pelvis and hips. *Id.* at 54. His imaging results found nothing remarkable in appearance. Pet'rs' Ex. 3 at 29.

About two weeks later, B.T. was taken to urgent care on May 8, 2019. Pet'rs' Ex. 5 at 5–7. Petitioners reported that he was suffering from a fever, inconsolableness, and a widespread rash. *Id.* After testing negative for numerous possible infections, B.T.'s providers advised petitioners that he be admitted to an emergency room. *Id.* at 7. At the Western Arizona Regional Medical Center ("Western Arizona"), B.T.'s treaters observed unsteady gait, something expected at his age, but noted that he could not walk more than five steps in a straight line. Pet'rs' Ex. 3 at 39, 42. Some of B.T.'s records diagnosed him with unspecified altered mental state with suspicions that he may be suffering from encephalitis. *Id.* at 35, 39, 46–47. Medical providers also performed a lumbar puncture which revealed elevated lymphocytes in his white blood cell count. *Id.* at 45. A CT scan that assessed his suspected altered mental state produced unremarkable results. *Id.* at 47. In their differential diagnosis, doctors listed encephalitis as one of many potential causes for B.T.'s symptoms. *Id.* at 44. Western Arizona then recommended that B.T. be transferred to Kingman Regional Medical Center ("Kingman") due to its expertise in pediatrics. *Id.* Before his transfer, B.T.'s notes listed his diagnosis as "unsure" but speculated that he was experiencing "likely viral meningitis vs encephalitis." *Id.*

Providers at Kingman listed "acute gastroenteritis" as his primary diagnosis with "rule out encephalitis" as his secondary diagnosis upon admittance. Pet'rs' Ex. 6 at 2–3. Kingman discharged B.T. on May 11, 2019, with a new diagnosis of "Nonspecific Syndrome Suggestive of Viral Illness." *Id.* at 3. His attending physician further noted that B.T. may have had a post-viral exanthem as well. *Id.* at 3–4. Doctors at Kingman also reported that B.T.'s parents were "concerned about the measles although clinically, it looks like he might have had EBV." *Id.* During a physical examination, B.T. appeared uncoordinated at times "but he was able to finish the walk toward mom. He did not fall down during this exercise." *Id.* at 6.

A couple of days later, B.T. returned to Dr. Reyes with complaints by his parents that he was "always freaking out" and concerns about his walking abilities. Pet'rs' Ex. 2 at 55. Dr. Reyes recorded that B.T. was diagnosed with a "viral syndrome with viral exanthem." *Id.* On May 24,

2019, B.T. visited Dr. Reyes once more in which no concerns of his gait or movement were reported. *Id.* at 58–59. At that appointment, Dr. Reyes diagnosed B.T. with acute obstructive laryngitis and an unspecified upper respiratory infection. *Id.* In the following months, B.T. exhibited no issues related to his ataxic symptoms. At his 15-month wellness visit in July 2019, Dr. Reyes listed petitioners' chief complaint as "doing well, just a lot of energy." *Id.* at 60. Petitioners reported no behavioral concerns and represented that B.T. received 12 hours of physical activity per day. *Id.* at 61. B.T. also demonstrated several communicative, movement, and social milestones. *Id.*

On October 6, 2019, B.T. returned to the emergency room after he experienced nausea and vomiting after he fell at home. Pet'rs' Ex. 3 at 71. Doctors discharged him that same day and observed "[n]o cognitive and/or functional deficits." *Id.* at 73. Four days later, B.T. returned to Dr. Reyes for his 18-month wellness visit where he demonstrated appropriate communication, motor, and social skills. Pet'rs' Ex. 2 at 63. Petitioners only complained that B.T. was "fussy" and "drooling." *Id.*

In January 2020—or nine months after receiving his MMR vaccine—B.T.'s medical records first indicated developmental concerns. That month, B.T.'s mother complained to Dr. Reyes that his speech development had "started regressing." *Id.* at 66. Dr. Reyes then ordered an evaluation with an early intervention program and a speech therapy consultation. *Id.* at 67–68. At his two-year visit in April 2020, B.T.'s mother again raised developmental concerns, sharing that B.T. no longer spoke and lacks social interaction with others. *Id.* at 69. His records further stated that B.T. failed multiple developmental milestones for communication appropriate for a two-year old. *Id.* At the same time, B.T. received normal results on his neurologic exam and did not display a limp. *Id.* at 70. Concerned by onset signs of autism spectrum disorder ("ASD"), Dr. Reyes referred B.T. to Dr. Mary Allare for further evaluation. *Id.*

At his September 2020 appointment, Dr. Allare found that B.T. exhibited speech delays and behavioral concerns associated with ASD. Pet'rs' Ex. 9 at 8. However, Dr. Allare determined from a screening tool that B.T.'s score was inconsistent for ASD. *Id.* at 14. Approximately two months later, B.T. saw Dr. Carol McLean for another ASD assessment where he scored in the "below average" range. Pet'rs' Ex. 7 at 37–38. Following his test results, Dr. McLean diagnosed B.T. with ASD, Level 2, "requiring very substantial support." *Id.* at 38–39. Subsequent visits with his new pediatrician and speech language pathologist echoed B.T.'s ASD diagnosis. *See* Pet'rs' Ex. 11 at 110, 124.

## II. PROCEDURAL HISTORY

In March 2022, petitioners filed their petition with the Office of Special Masters for compensation under the Vaccine Act for B.T.'s alleged encephalitis injuries. *See* Pet'rs', ECF No. 1. Two years later, respondent filed a report under Vaccine Rule 4(c) and moved to dismiss this case for failure to state a claim. *See generally* Resp't Rule 4(c) Report, ECF No. 25. Respondent also argued that petitioners asserted a "veiled autism case" that previous courts have dismissed. *Id.* at 17–20. Following a July 2024 status conference, the Chief Special Master expressed his skepticism toward petitioners' claim which was asserted under the Vaccine Act's injury Table. *See* Scheduling Order, ECF No. 26 at. 2. The Chief Special Master then instructed petitioners to submit an evidentiary memorandum that would substantiate B.T.'s claim and to address concerns

regarding B.T.'s autism diagnosis. *See id.* When writing their memorandum, petitioners were advised to not file an expert report "*at this time*." *Id.* (emphasis added).

After multiple requests for an extension of time, petitioners filed their memorandum in February 2025. *See* Pet'rs' Mem., ECF No. 29. Respondent filed its response two months later. *See* Resp. to Mem., ECF No. 32. Petitioners then sought leave to file a reply, which the Chief Special Master granted. Pet'rs' Mot. for Leave to File Reply, ECF No. 33. However, the Chief Special Master struck petitioners' reply because they submitted their brief several days after the deadline passed. *See* Order to Strike, ECF No. 35.

In November 2025, the Chief Special Master dismissed petitioners' Table encephalitis claim. *See* ECF No. 37 at 15. After conceding that "*some*" evidence established that B.T. suffered from an acute encephalitis, the Chief Special Master held that petitioners failed to prove that B.T. suffered from chronic encephalopathy. *Id.* at 13–14 (emphasis in original). Upon review, B.T.'s medical records did not show persistent symptoms of ataxia following his May 2019 emergency room visit. *Id.* at 14. The Chief Special Master also disregarded an affidavit executed by B.T.'s mother because his records reflected healthy development and remained silent about developmental concerns during this time. *Id.* at 14. Still, the Chief Special Master recognized that B.T. "experienced some unusual symptoms not long after" his vaccination "that *could* be the basis of" a claim based on causation. *Id.* at 15 (emphasis in original).

Accordingly, the Chief Special Master allowed petitioners to submit additional proof to establish a claim based on causation in fact. *Id.* In April 2026, petitioners responded that they "are not able to provide preponderant evidence that the MMR vaccination . . . caused B.T. to suffer his current neurologic or neurodevelopmental disorder." Resp. to Order to Show Cause, ECF No. 40. Thereafter, the Chief Special Master dismissed the petition. *See* Decision Dismissing Pet., ECF No. 42. In May 2026, petitioners moved for this Court to review the Chief Special Master's decision. ECF No. 43. Petitioners also filed a Memorandum of Objections to support their motion. *See* Pet'rs' Mem. of Objections, ECF No. 46.[2] Respondent then filed its response brief on June 17, 2026. Resp't Mem. in Resp., ECF No. 48.

## III. LEGAL STANDARD

The Vaccine Act grants this Court with jurisdiction to review decisions of the special masters. 42 U.S.C. § 300aa-12(e)(1)–(2). When reviewing a special master's decision, the Court may: (1) "uphold the findings of fact and conclusions of law;" (2) "set aside any findings of fact or conclusions of law . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" or (3) "remand the petition to the special master for further action." 42 U.S.C. § 300aa-12(e)(2)(A)–(C). "Fact findings are reviewed . . . under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard." *Munn v. Sec'y of Dep't of Health & Hum. Servs.*, 970 F.2d 863, 870 n. 10 (Fed. Cir. 1992).

---

[2] Petitioners originally submitted their Memorandum of Objections without a certificate of service. *See* ECF No. 44. A day later, petitioners filed a corrected Memorandum of Objections that included the certificate. *See* ECF No. 46. For purposes of this Opinion, the Court will cite to petitioners' subsequent submission of its memorandum, ECF No. 46.

As a "highly deferential standard of review," the United States Court of Appeals for the Federal Circuit has cautioned that lower courts should not "second guess a Special Master[']s fact-intensive conclusions." *Hines v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1527–28 (Fed. Cir. 1991); *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993). Courts will not "substitute its judgment for that of the Special Master merely because it might have reached a different conclusion" either. *Beckwith v. Sec'y of Health & Hum. Servs.*, 180 Fed. Cl. 368, 378–79, (2026) (quoting *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 718 (2009) (cleaned up)). Nor will the Court "reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011). At bottom, "reversible error is extremely difficult to demonstrate if the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision." *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000).

## IV. DISCUSSION

Petitioners seeking compensation under the Vaccine Act "must prove by a preponderance of the evidence that the injury or death at issue was caused by a vaccine." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1341 (Fed. Cir. 2010) (citing 42 U.S.C. §§ 300aa-11(c)(1), 300aa-13(a)(1)). The Vaccine Act provides two ways for petitioners to establish causation: (1) through a statutorily prescribed Vaccine "Table injury," 42 U.S.C. § 300aa-14(a), or (2) an "off-Table injury" that requires a showing of causation in fact. *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005). Relevant to this case, petitioners asserting a Table claim must demonstrate that they sustained an "illness, disability, injury or condition identified in the Table . . . within the specified period of time after receiving the vaccine." 42 U.S.C. § 300aa-11(c)(1)(C)(i). In these instances, causation is presumed. *Broekelschen*, 618 F.3d at 1341–42 (citing 42 U.S.C. § 300aa-11(c)(1)(C)(i)).

To assert a Table encephalitis claim, petitioners must demonstrate that they suffered from both acute encephalitis and a chronic encephalopathy. 42 C.F.R. § 100.3(c)(3).[3] Acute encephalitis is established by proof of neurologic dysfunction and inflammatory process in the brain. 42 C.F.R. § 100.3(c)(3)(1). Neurologic dysfunction includes focal cortical signs, cranial nerve abnormalities, or cerebellar dysfunction—such as *ataxia*. 42 C.F.R. § 100.3(c)(3)(i)(A)(1). For children older than two months of age, inflammatory process in the brain must show "cerebrospinal fluid" exceeding "5 white blood cells (WBC)/mm3." 42 C.F.R § 100.3(c)(3)(i)(B). Symptoms of acute encephalitis must also appear within five to 15 days of receiving a vaccine. 42 C.F.R § 100.3(c)(3). Next, chronic encephalopathy occurs when a change in mental or neurological status from the applicable time period for acute encephalitis persists for at least six months. 42 C.F.R § 100.3(d)(1)(i). However, petitioners "who return to their baseline neurologic state . . . within less

---

[3] The following definitions come from the Vaccine Injury Table's Qualifications and Aids to Interpretation ("QAI"). *See generally* 42 C.F.R. § 100.3. The Office of Special Masters and this Court use QAIs to interpret and assist them in determining whether petitioners have established their Table claims for various conditions and injuries. *See DeRoche v. Sec'y of Dep't of Health & Hum. Servs.*, No. 97-643V, 2002 WL 603087, at *17 n. 47 (Fed. Cl. Mar. 28, 2002).

than 6 months from the first symptom" of acute encephalitis "shall not presumed" to be an extension of acute encephalitis." *Id.*

Petitioners only seek this Court's review of the Chief Special Master's finding that B.T. did not suffer from chronic encephalopathy. *See* ECF No. 46 at 2. According to petitioners, the Chief Special Master erred in concluding that B.T.'s ataxia did not persist for at least six months following his first symptoms of acute encephalitis in April 2019. *Id.* at 2, 12. Petitioners also assert that sufficient evidence demonstrates that B.T. suffered from speech regression following his MMR vaccination to support their Table claim. *Id.* at 2, 15. In opposition, respondent claims that the Chief Special Master did not engage in an arbitrary or capricious review of the record on both arguments. ECF No. 48 at 7, 11. As detailed below, the Court sustains the Chief Special Master's decision.

**A. B.T.'s Ataxia Did Not Persist For At Least Six Months Following His Vaccination Which Defeats His Table Claim.**

In his findings, the Chief Special Master held that petitioners' Table claim failed because B.T. did not suffer from chronic encephalopathy. ECF No. 37 at 14. According to the Chief Special Master, a review of B.T.'s medical records could *only* establish (1) that he developed a fever in mid-May 2019; (2) medical providers did not view his ataxic behaviors "as significant, or evidence of continued encephalitis;" and (3) petitioners did not raise any concerns about his ataxia until January 2020, or nine months after his symptoms arose. ECF No. 37 at 13–14. In response, petitioners assert that B.T.'s ataxia persisted for six months after his vaccination which establishes B.T.'s chronic encephalopathy. ECF No. 46 at 14–15. However, petitioners provide little proof to support their argument. Instead, they focus on establishing that B.T. suffered from encephalitis in early May 2019—or a month after his MMR vaccine. *Id.* at 12–14. Without more, the Court holds that substantial evidence supported the Chief Special Master's conclusion.

To start, petitioners take issue with the Chief Special Master's second finding that B.T.'s ataxia in May 2019 was not significant. ECF No. 46 at 12–13. By their account, B.T.'s medical records during that time period evidenced ataxia and encephalitis. *Id.* at 13. For instance, petitioners cite B.T.'s visit to Dr. Reyes who ordered x-rays of his hips. Pet'rs' Ex. 2 at 54. They also reference B.T.'s medical records illustrating his difficulty walking, his CT scan, and his doctor's differential diagnosis that included encephalitis. ECF No. 46 at 13–14 (citing Pet'rs' Ex. 2 at 34, 42–43, 54; Pet'rs' Ex. 3 at 29, 43, 47). Whether these concerns were considered "significant" seems irrelevant toward establishing chronic encephalopathy. Under the Table's QAIs, a petitioner need not establish materiality to support a Table encephalitis claim. 42 C.F.R § 100.3(d)(1)(i). *See id.*

In so far that petitioners seek review of this conclusion, the Chief Special Master did not err. While B.T.'s doctors *suspected* encephalitis and administered tests due to his altered mental state, they ultimately diagnosed him with other conditions. At Western Arizona, B.T.'s physician opined that he likely suffered from "viral meningitis vs encephalitis." Pet'rs' Ex. 3 at 44. Kingman admitted B.T. for acute gastroenteritis and discharged him with "Nonspecific Syndrome Suggestive of Viral Illness" and post-viral exanthem. Pet'rs' Ex. 6 at 3–4. And during his emergency room visit, petitioners expressed their concerns about measles and another doctor speculated that B.T. suffered from EPV. *See id.* Neither petitioners nor the Chief Special Master identified whether continued diagnoses of encephalitis are necessary toward establishing chronic

encephalopathy. But even if the Court credits B.T.'s May 2019 health issues toward his Table claim, petitioners still failed to prove the salient issue on review—whether B.T.'s altered mental state persisted for more than six months.

Indeed, B.T.'s records are devoid of continuous symptoms of chronic encephalopathy. As the Chief Special Master determined, the relevant timeframe to assess B.T.'s purported symptoms ranges from late-April to October 2019. *See* ECF No. 37 at 14. Starting in late May 2019, B.T. visited Dr. Reyes multiple times and his parents did not complain of his ataxic behaviors. *E.g.*, Pet'rs' Ex. 2 at 58–59. In fact, a July 2019 doctor's visit reported that B.T. was "doing well, just a lot of energy." Pet'rs' Ex. 2 at 60. Dr. Reyes also reported that B.T. "does not have any special health care needs" and that he exhibited no behavioral issues. *Id.* at 60–61. The absence of continued, and documented, issues regarding B.T.'s mental state supports a finding that he returned to his baseline neurologic state, thereby undermining petitioners' claim. 42 C.F.R § 100.3(d)(1)(i).

As a rebuttal, petitioners make a sole reference to B.T.'s October 2019 emergency room visit to establish his continued ataxia. *See* ECF No. 46 at 14. There, B.T. arrived with nausea and vomiting after falling on his head and his medical records indicated that he walked with an "unsteady gait." Pet'rs' Ex. 3 at 71. Nonetheless, the Court agrees with respondent that B.T.'s visit was a "discrete, fleeting encounter" that "does not weigh in favor of meeting the Table's chronic encephalopathy criterion." ECF No. 48 at 10. This health episode coincided with a time period in which no concerns of B.T. experiencing ataxic symptoms were recorded. While his records memorialized that he visited Kingman for encephalitis, B.T.'s caregivers believed that his nausea arose from "sick contacts," including his sister who was vomiting the day before. Pet'rs' Ex. 5 at 71, 74. In this instance, cherry-picking one event to establish a chronic condition fails to carry petitioners' burden.[4]

Petitioners also provide zero analysis as to why B.T.'s unsteady gait and nausea observed during his emergency room visit resulted from his MMR vaccination. In their opinion, the mere happenstance of his symptoms supports their *ipse dixit* conclusion. *See* ECF No. 46 at 14. Not so. Skeletal arguments, "really nothing more than an assertion, does not preserve a claim." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (citations omitted). This Circuit recognizes that perfunctory and undeveloped arguments may be waived and not considered. *SmartGene, Inc. v. Advanced Biological Lab'ys, SA*, 555 F. App'x 950, 954 (Fed. Cir. 2014). Here, petitioners' scant reasoning of how B.T.'s fall and subsequent nausea demonstrates prolonged ataxia waives this issue. Their failure to point to other instances "that B.T.'s ataxia persisted after May 2019" arguably waives this issue as well. *See* ECF No. 46 at 14.

Along these lines, petitioners contend that the Chief Special Master erred because he failed to consider B.T.'s October 2019 health episode. However, special masters are presumed to have considered all evidence, unless expressly stated otherwise. *See Hazlehurst v. Sec'y of Health & Hum. Servs.*, 604 F.3d 1343, 1352 (Fed. Cir. 2010) (citing *Medtronic, Inc. v. Daig Corp.*, 789 F.2nd 903, 906 (Fed. Cir. 1986)); *Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) (discerning no basis to equate failure to mention with evidence with a failure to consider

---

[4] In plain English, persists means "to continue to exist especially past a usual, expected, or normal time." *Persist*, Merriam-Webster, https://www.merriam-webster.com/dictionary/persist, (last visited July 27, 2026). The almost-complete lack of evidence of symptoms that could be construed as ataxia post-May 2019 and B.T.'s good health during that time period proves fatal to petitioner's Table encephalitis claim.

evidence). Lastly, petitioners posit that B.T.'s nausea and vomiting "corroborates his mother's testimony that she expressed her concern about B.T.'s ataxia" to Dr. Reyes beforehand. ECF No. 46 at 14–15 (citing Pet'rs' Ex. 1 at ¶ 34).[5] The Court discusses the reliability of his mother's affidavit below. Regardless, petitioners fail to connect an isolated event involving vomiting and unsteady balance to demonstrate prolonged ataxia that otherwise remains absent from the record.

Therefore, the Court concludes that the Chief Special Master reasonably found that B.T. did not suffer from persistent symptoms of ataxia for at least six months following his MMR vaccine to support his Table encephalitis claim.

**B. Petitioners Failed to Demonstrate that B.T. Suffered from Speech Regression from His Vaccine and Essentially Asks this Court to Reweigh the Evidence.**

Petitioners next claim that the Chief Special Master arbitrarily and capriciously found that B.T. did not suffer from speech regression following his MMR vaccination. ECF No. 46 at 15–17. Through their own review, B.T.'s medical records fails to demonstrate healthy development and the "special master gave no weight" to his mother's affidavit addressing these issues. *Id.* at 16–18. By contrast, respondent contends that petitioners improperly request this Court to reweigh evidence that the Chief Special Master already considered. ECF No. 48 at 11–15.

To demonstrate B.T.'s speech regression, petitioners only cite his 12 and 15-month wellness visits. ECF No. 46 at 16. At both appointments—in April and July 2019—B.T. could speak three to four words. Ex. 2 at 50, 61. According to petitioners, this purported lack of development "between 12 months and almost 16 months of age is not normal and can be a symptom of an encephalitis that damaged the speech center of the brain." ECF No. 46 at 17. But petitioners proffer no medical evidence, testimony, or cognizable source to support their bare assertion. They again present an *ipse dixit* argument without further analysis to establish their claim.

As noted by the Chief Special Master, Dr. Reyes reported no concerns regarding B.T.'s speech development during that timeframe. ECF No. 37 at 14. In fact, she wrote "there are no concerns about the way [B.T.] speaks" at his 12 and 15-month checkups. Ex. 2 at 50, 61. Petitioners also failed to confront B.T.'s 18-month visit, in which Dr. Reyes noted that B.T. could speak six words. *Id.* at 63. Furthermore, B.T.'s mother indicated to Dr. Reyes that his speech "started regressing" in January 2020. ECF No. 37 at 8, 14 (quoting Ex. 2 at 66). On that timeline, B.T.'s alleged speech regression began well outside the six-month period for examining his purported chronic encephalopathy. Therefore, the Chief Special Master reasonably found that B.T.'s medical records did not support any speech regression within the applicable time period.

To rebut these findings, petitioners claim that an affidavit executed by B.T.'s mother establishes their son's speech regression. ECF No. 46 at 15–16. The affidavit alleges that Dr. Reyes would "always shut [petitioners] down by saying that B.T. 'would grow out of' his speech delays." Pet'rs' Ex. 1 at ¶ 38. From petitioners' recollection, "[i]t took eight months of battling with Dr. Reyes to get her to listen to [their] concerns about B.T.'s speech." *Id.* at ¶ 39. The Chief Special Master acknowledged that petitioners raised B.T.'s speech regression primarily through witness statements, not medical records. ECF No. 37 at 14. But since B.T.'s medical records were

---

[5] Petitioners' affidavit makes no mention of B.T.'s October 2019 emergency room visit either. *See generally* Pet'rs' Ex. 1.

"silent on developmental concerns," the Chief Special Master did not assign much weight to their sworn testimony. *Id.* In other words, "absent corroborative evidence that would suggest petitioners *did in fact* experience what they now allege," the Chief Special Master refused "to accept [petitioners' allegations] as true simply because witness statements so maintain." *Id.* (emphasis in original). By giving "no weight" to the affidavit, petitioners assert that the Chief Special Master erred. ECF No. 46 at 16. However, what petitioners seek on review is not supported by the record.

Under the Vaccine Act, special masters are barred from finding a Table injury based on claims made by the petitioner that are unsubstantiated by medical records or medical opinions. *Cucuras v. Sec'y of Dep't of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) (citing 42 U.S.C. § 300aa-13(a)(1)). Special masters give greater weight to medical records because it "reflects the familiar and reasonable assessment that contemporaneous documentary evidence . . . prepared by professionals doing their jobs independently of litigation, can be (though is not necessarily) more reliable than testimony of interested parties." *Bello v. Sec'y of Health & Hum. Servs.*, 158 Fed. Cl. 734, 747 (2022) (quoting *Rogero v. Sec'y of Health & Hum. Servs.*, 748 F. App'x 996, 10001 (Fed. Cir. 2018)). In general, "written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later." *Ruesser v. Sec'y of Health & Hum. Servs.*, 28 Fed. Cl. 516, 523 (1993); *Skinner v. Sec'y of Health & Hum. Servs.*, 30 Fed. Cl. 402, 410 (1994). Indeed, "oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight." *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947).

"This rule, however, should not be applied inflexibly, because medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citation omitted). In these situations, testimony offered to rebut medical records must be "consistent, clear, cogent, and compelling." *Id.* A special master must also consider the credibility of the individual offering the testimony. *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993). As previously mentioned, this Court may not "reweigh the factual evidence [or] assess whether the special master correctly evaluated the evidence." *Porter*, 663 F.3d at 1249; *Oliver v. Sec'y of Health & Hum. Servs.*, 900 F.3d 1357, 1362 (Fed. Cir. 2018) ("[Petitioners] repeatedly fault the Chief Special Master for failing to afford greater weight to their expert's testimony and supporting evidence . . . We cannot review such challenges.").

Given this Circuit's unwavering precedent, the Court refuses to reweigh petitioner's affidavit. *Porter*, 663 F.3d at 1249; *Broekelschen*, 618 F.3d at 1349; *Munn*, 970 F.2d at 871. Petitioners' challenge to the weight of certain evidence against medical records is hardly a novel issue. *See Oliver v. Sec'y of Health & Hum. Servs.*, 900 F.3d 1357, 1362 (Fed. Cir. 2018) (declining to review a challenge that the Special Master afforded to little weight to expert testimony); *see also Martinez v. Sec'y of Health & Hum. Servs.*, 165 Fed. Cl. 76, 88–89 (2023) (determining petitioners' challenge to the Special Master's decision to give greater weight to medical record evidence rather than testimony was at its core a request for *de novo* review). Here, B.T.'s mother executed her affidavit on March 18, 2022—or almost three years after B.T.'s ataxic issues began. Pet'rs' Ex. 1 at 7. Her testimony advances facts that remain silent or contradict B.T.'s medical records following his MMR vaccination. *See generally id.* Thus, petitioners' affidavit comes as self-serving testimony that recollected events from prior years. *See Bello*, 158 Fed. Cl. at 747. On the other hand, B.T.'s medical providers recorded contemporaneous and disinterested observations

without consideration for future litigation. *See id.* Aside from petitioners' one-sided representations, there are no indications that B.T.'s medical records are incomplete or incorrect. Under these circumstances, the Chief Special Master properly relied on B.T.'s medical records when determining if he suffered from speech regression. Therefore, the Court agrees that petitioners' affidavit should be accorded little weight. *United States Gypsum Co.*, 333 U.S. at 396.[6]

Petitioners further note that the Chief Special Master denied them the opportunity to present expert testimony regarding B.T.'s speech development. ECF No. 37 at 17 n. 2, 18 n.3. Respondent replies that the Chief Special Master allowed petitioners to consult with an expert to support their non-Table claim. ECF No. 48 at 14–15 (citing ECF No. 37 at 15). By failing to provide such testimony to support their non-table claim, respondent alleges that petitioners waived this issue. *Id.* at 15 (citing Vaccine R. 8(f)(1)). While respondent confuses the Chief Special Master's words with another order found in the docket, this Court cannot review petitioners' argument.

In their briefing, petitioners reference the Chief Special Master's *Scheduling Order*, which "directed the petitioners to refrain from filing an expert report." ECF No. 46 at 17 n. 2, 18 n.3. That does not refer to the Chief Special Master's Show Cause Order in his Findings of Fact as respondent suggests. In his Scheduling Order, the Chief Special Master expressed his "preliminary but *informed view* [] that this claim may not be tenable." *See* July 18, 2024, Sched. Order, ECF No. 26 at 2 (emphasis in original). The Chief Special Master then allowed petitioners to file an evidentiary memorandum to substantiate their claim that B.T. experienced chronic encephalopathy. *Id.* However, the Chief Special Master asked petitioners to "refrain from filing an expert report at this time, although they may *consult* with an expert in preparing this requested memorandum." *Id.* (emphasis in original). In their evidentiary memorandum, petitioners concluded that the Chief Special Master should allow them to obtain "an expert witness report that addresses the issues presented by the Petitioners' claims." *See* ECF No. 29 at 18. It remains unclear whether petitioners formally moved to submit an expert report, nor did they represent that they consulted with an expert before submitting their memorandum.

Such review of the Chief Special Master's purported disallowance of expert testimony is a discretionary matter that would trigger this Court's abuse of discretion standard. *See Munn*, 970 F.2d at 870 n. 10. But petitioners only seek review of the Chief Special Master's finding regarding B.T.'s chronic encephalopathy. ECF No. 46 at 2, 11. In general, "points not argued will not be considered." *United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring in judgment). Courts rely on litigants to "frame the issues for decision" and they decide "only the questions presented." *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020) (quotations omitted).

---

[6] As further support, B.T.'s mother testified that her son stopped talking when he visited the emergency room in May 2019. *See* Pet'rs' Ex. 1 at ¶ 18. But as the Chief Special Master determined, "the medical records for this visit contain no such complaints." ECF No. 37 at 3. In addition, petitioners represented to Dr. McLean that B.T. "had developed over 20 words and then stopped using many of them." Pet'rs' Ex. 7 at 37. That statement contradicts Dr. Reyes' records that B.T. could speak six words a couple months before his speech regression began. Pet'rs' Ex. 2 at 63. It also runs inconsistent with Mrs. Taguacta's testimony that B.T. could only speak 10 words at two years and six months old. Pet'rs' Ex. 1 at ¶ 37. These statements should have given the fact-finder event greater pause to accord weight to petitioners' affidavit.

Arguments raised in footnotes are not preserved either. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006). By failing to raise the Chief Special Master's apparent decision to preclude expert testimony, the Court will not entertain petitioners' argument. In addition, petitioners refer to their inability to use expert testimony in footnotes, thereby waiving the issue. *SmithKline Beecham*, 439 F.3d at 1320.[7]

Therefore, the Court finds that the Chief Special Master did not err when concluding that petitioners failed to show that B.T. suffered from speech regression development from his vaccination.

### C. Since Petitioners Cannot Prevail on Their Table Encephalitis Claim, the Court Need Not Address the Parties Arguments Regarding B.T.'s Autism Diagnosis.

After finding petitioners could not prevail on a Table encephalitis claim, the Chief Special Master acknowledged that record evidence demonstrated that B.T. was diagnosed with autism. *See* ECF No. 37 at 15 n. 4. However, he noted that "the Program has *never* found that an ASD condition could be vaccine-caused." *Id.* (emphasis in original). Petitioners argue that conflicting test results did not address "whether B.T.'s developmental delays could have been caused" by his purported encephalitis. ECF No. 46 at 18–19. They posit that expert testimony may properly develop this issue. *Id.* at 19–20. Because the Court sustains the Chief Special Master's decision regarding B.T.'s chronic encephalopathy, it declines to address this issue further.

## V. CONCLUSION

For the foregoing reasons, the Court hereby **AFFIRMS** the Chief Special Master's decision and **DENIES** petitioners' motion for review, ECF No. 43. The Clerk of the Court is directed to **ENTER JUDGMENT** in favor of respondent consistent with this Order. In accordance with Vaccine Rule 18(b), the parties shall file a motion on or before **September 2, 2026**, that proposes redactions for the Court to make this Opinion public.

**IT IS SO ORDERED.**

s/ Loren A. Smith

Loren A. Smith,
Senior Judge

---

[7] Special masters also retain "wide discretion to conduct proceedings in a manner which, in their individual judgment, best facilitates their ability to render a decision in a particular case." *Synder ex rel. Synder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 720 (2009) (citing Vaccine R. 8(a) ("The special master will determine the format for taking evidence and hearing argument based on the specific circumstances of each case and after consultation with the parties.")). Petitioners do not discuss these topics in their motion for review.